Sherry v. Cedarbrook Country Club

*James F. Masterson*, for plaintiffs.

*Francis I. Daly, Jr.*, for defendants.

*Michael Shekmar*, for intervenors.

REIMEL, J., November 17, 1960.—This is an action in equity alleging that a resolution was adopted at a special meeting of defendant club on September 3, 1958, to sell the club property and to relocate as a result of misstatements of fact and misrepresentations of law; that a resolution to exercise an option to purchase ground for relocation adopted at a meeting held July 13, 1959, was illegal; that officers and directors of defendant club sold proprietary membership certificates to persons who favored adoption of the resolution to exercise the option. First Pennsylvania Banking and Trust Company was made a party defendant as the transfer agent of the proprietary membership certificates of the club. Plaintiffs requested an injunction against defendants from offering, transferring, issuing, selling or reissuing proprietary membership

certificates pending determination of the legal questions involved; from exercising the option to purchase land for relocation; from holding any further meetings or taking any further action relating to relocation, and that the resolution to exercise the option to purchase land for relocation be declared defeated.

Upon consideration of the complaint, affidavits filed and security entered, a preliminary injunction issued.

An answer was filed by defendant denying all the essential averments of the complaint and by counterclaim alleged that all plaintiffs, except Gallagher, had voted in favor of relocation and that plaintiffs, in endeavoring to prevent relocation, are attempting to cause a dissolution of the club and a distribution of its assets to the profit of plaintiffs and other proprietary members. Defendant club requested affirmative relief enjoining plaintiffs from interfering or inducing others to interfere with any action relating to relocation; from taking any action or inducing others to take any action to achieve dissolution of the club or distribution of its assets.

Five persons who were active members of the club filed a petition to intervene as a committee representing active members to prevent a dissolution of the club. Intervention was granted by the court, and after the withdrawal of plaintiffs' motion to strike intervening defendants, the court determined that all parties will be permitted to intervene. At later dates, the court permitted, in addition to G. R. Phelps et al., as committee representing active members, intervention by Mary S. Murphy, Executrix of the Estate of William E. Murphy, Deceased; by Carl C. Fischer, Executor of the Estate of John A. Fischer, Deceased; by Stanley B. Furstenau, Executor of the Estate of Martin C. Furstenau, Deceased; by Marguerite Lindh, Executrix of the Estate of David Lavis, Deceased and by

Margaret Esherick and Provident Tradesmens Bank and Trust Company, Executors of the Estate of Joseph Esherick, Deceased.

Intervening defendants, G. R. Phelps et al., filed an answer denying all the essential averments of the complaint and by new matter alleged that plaintiffs are seeking to cause a dissolution of the club and that plaintiffs having permitted the club to sell are estopped to refuse to permit performance of the portion of the resolution to relocate. By counterclaim, intervening defendants, G. R. Phelps et al., alleged that they have contributed to the preservation and improvement of the assets of the club; that they have a legally enforceable right to proprietary membership certificates; that they should, therefore, share equally with proprietary members in the event of dissolution and that they have a statutory right to vote upon voluntary dissolution of the club. Intervening defendants, G. R. Phelps et al., requested affirmative relief enjoining plaintiffs from engaging in acts combining with others in acts that would bring about a dissolution and liquidation of the club. They seek a declaration of the status of the club and a definition of the rights and privileges of active members as distinguished from proprietary members in the assets of the club in the event of a forced dissolution.

Plaintiffs' reply denied the averments of the counterclaim.

The court ordered dissolved that portion of the injunction restricting defendants from taking any further action in connection with relocation and that portion which prevented defendant from exercising the option to purchase land for relocation. The court further ordered, by agreement of counsel, that Samuel Weinrott, Esq., be appointed as special master for the purpose of conducting hearings, taking testimony and

reporting to the court in an effort to expedite this litigation.

A stipulation entered by the court, by agreement of counsel, permitted Stanley B. Furstenau, intervening defendant, to refrain from filing any further pleadings, except that he would be permitted when the master takes testimony to adduce testimony or file pleadings, if necessary.

After a full hearing on plaintiffs' petition to amend the complaint, permission was granted to amend. The amended complaint alleged with more particularity the misrepresentations of defendant club leading to the adoption of the resolution at the September 3, 1958, meeting; the reasons why the resolution was illegal and improper; that the sale of proprietary membership certificates as a scheme to obtain adoption of the relocation resolution followed a determination by club officers and directors on December 2, 1957, to sell and relocate the club. Plaintiffs sought additional relief in a decree declaring part of the resolution relating to relocation null and void; in a request that a receiver be appointed to administer the club and in a decree declaring that holders of proprietary membership certificates acquired after December 2, 1957, shall not be entitled to vote on any matter affecting proprietary interests of the club. An answer by defendant, Cedarbrook Country Club, denied all the essential averments of the complaint, and by counterclaim alleged that all plaintiffs except Gallagher, who voted against the resolution, are bound by September 3, 1958, resolution in favor of relocation; the proceeds from sale of the club, since realized as a result of duly authorized actions, are impressed with a trust for purpose of relocation for the benefit of both proprietary and nonproprietary members and that plaintiffs are seeking to force a dissolution of the club and a distribution of the assets.

Defendant club requested affirmative relief enjoining plaintiffs from interfering or inducing others to interfere with any action relating to relocation; from taking any action or inducing others to take any action to achieve dissolution of the club or distribution of the assets. Defendant, Mary S. Murphy, in her answer alleged that there are 500 outstanding certificates of proprietary membership; that the question of the exercise of the option was moot; new matter alleged that she has a proprietary interest in the real and personal property of the club and that she has an interest in the corporation; has a property right in its assets and is entitled to share pro rata with other certificate holders in any distribution of the assets of the said corporation. Defendant, Carl C. Fischer, in his answer demands proof of the allegations of the complaint because the means of proof are within the exclusive control of plaintiffs and original defendants and by new matter alleged he has an interest in the corporation, has a property right in its assets and is entitled to share pro rata with other certificate holders in any distribution of the assets. Plaintiffs' reply to Mary S. Murphy avers that there are less than 200 certificates and that the question of option exercise is not moot, and to the new matter avers that the rights and privileges of intervening certificate holders are defined by the bylaws and resolutions of the club. Plaintiffs' reply to Carl C. Fischer avers that the rights and privileges of intervenor's certificate are defined in the bylaws and resolutions of the club. Defendant, Cedarbrook Country Club, in reply to Carl C. Fischer, avers that the intervenor is entitled only to such rights as are held by other persons of the same class; the rights are fixed by the certificate and bylaws of the club and are subject to alteration or extinguishment by changes in the bylaws.

The master after holding four meetings filed an interim report which was approved by the court and, in accordance with the report, the court ordered a stay of further proceedings until the members of the Cedarbrook Country Club entitled to vote thereon have had an opportunity to vote upon the plan for settlement of litigation and retirement of proprietary membership certificates of Cedarbrook Country Club which was submitted by counsel to the court. The order authorized the master to attend the meetings and supervise the vote and report to the court and authorized the Cedarbrook Country Club to pay $30,000 of the club's funds on account of the purchase of the property for relocation. The order stated that, upon approval of the plan, the court would entertain a petition for a rule to show cause why all persons holding Cedarbrook Country Club proprietary membership certificates should not be joined as parties in this action and why they should not be permanently barred from asserting any claim in excess of the amount provided for them in the plan for settlement of litigation.

Following the meeting to vote on the plan, supervised by the master, the master's second interim report was filed and approved by the court. It was stipulated and agreed between counsel that all proprietary members of Cedarbrook Country Club shall have the rights conferred by the plan in the event that they submit their written resignations from the club on or before April 30, 1960.

In accordance with the order issued by the court, the petition of defendants for rule to show cause why certain persons should not be joined as parties and why plan for retirement of proprietary membership certificates of Cedarbrook Country Club should not be declared effective and said parties should not be permanently barred from asserting any further claim was

granted. The petition, as granted, made provision for notice to all parties to be joined.

Answers were filed which raised questions of jurisdiction. After a hearing held on the rule, the court filed an opinion which made the rule absolute and affirmed the order of the court that respondents who are holders of proprietary membership certificates of Cedarbrook Country Club shall be made parties of record. Exceptions to the order making the rule absolute were filed and allowed by the court . . .

### Discussion

Cedarbrook Country Club is a nonprofit, nonstock corporation, organized in 1915 under the laws of Pennsylvania, for "the maintenance of a Club for the encouragement of golf and other athletic sports," and to exist perpetually.

In 1958, the club accepted a substantial offer to sell the golf course and club house, and its officers and board sought and obtained an option to buy a new site. Such was the situation when this suit in equity was commenced by five proprietary members of the club on July 15, 1959.

The issues in the case require construction of certain portions of the club's bylaws which are embodied in the certificate used to evidence proprietary membership. This is the fourth proceeding since 1946 in the Courts of Common Pleas of Philadelphia County in which construction of the terms of this proprietary membership certificate has been involved. An analysis of the provisions of the certificate and of the background of this controversy, including the proposed relocation of the club, is necessary for the proper consideration of the numerous questions that arise.

Each proprietary membership certificate has a "face value" of $1,000. The amounts paid to the club for

issuance of such certificates have ranged from $200 to $1,000. Members have always been able to purchase proprietary membership certificates from the club for $200 initially paid on account of the face value, which is in accordance with the terms of the certificate and the bylaws. The difference, if any, between the face value and the amount paid on account is referred to herein as the "unpaid balance," upon which the holder by the terms of the certificate agrees to pay the club interest at six percent per year. Interest has always been so charged with respect to the unpaid balance on certificates held by nonmembers, but since 1933 interest has been waived by the board of governors in the exercise of its discretion with respect to certificates held by dues paying members in good standing. This interest when charged to member certificate holders was payable in addition to their dues, which were in the same amount as those paid by other active members.

The bylaws provide in effect that all proprietary interests in the club, either real or personal, are vested solely in the proprietary members and that the proprietary members had the sole right to vote on questions affecting the proprietary interest or ownership of the club's property and also with respect to matters affecting the certificates of proprietary membership. The bylaws further require that not less than eight of the 15 members of the board of governors should be proprietary members. Otherwise the active members and the proprietary members have equal rights as to voting, holding office and other matters affecting the government and operations of the club.

The club has been located at its present site at the corner of Limekiln Pike and Cheltenham Avenue for approximately 40 years. On September 3, 1958, it entered into an agreement with John B. Merriam Com-

pany to sell the club house, golf course and certain personal property for $2,150,000, pursuant to a vote of its proprietary members at a meeting held on that date in accordance with the club bylaws. Settlement is to be consummated on or before September 3, 1961, which date may be accelerated by the buyer. In the meantime, the club continues to occupy the property and under the agreement of sale may continue in possession under a lease from the buyer for 18 months after settlement, subject to a number of conditions not here relevant. Neither the validity nor the propriety of this agreement of sale has been questioned in these proceedings, and the consummation of the transaction appears to be desired by all members who have expressed in these proceedings any sentiments relating to it.

The officers of the club, pursuant to authority given them by its board of governors, entered into an option agreement with Leo Posel and others for the purchase of land in Montgomery County for an aggregate consideration of $295,000 as a site for a new golf course and club house. Acquisition of this option was authorized by a meeting of the proprietary members held September 3, 1958. In substance, this option agreement required an initial down payment of $1,000, which with subsequent payments are to be credited to the purchase price. Authority to complete the purchase was sought from the proprietary members at a meeting held July 13, 1959, pursuant to due notice. There are different contentions as to what happened at this meeting, which in view of the adoption of a plan for settlement hereinafter described are not necessary to discuss here in detail. When a vote was taken, the proprietary members were evenly divided, but there was a vigorous difference of opinion as to one ballot, the legibility of which was questioned. A second vote

of the proprietary members was taken that resulted in 42 votes in favor and 41 against consummating the purchase, with one proprietary member abstaining from voting. The complaint in this suit was filed two days later.

The action raises issues between and among the following parties or groups of parties: (1) Plaintiffs and certain proprietary members affiliated with them who sought to prevent relocation of the club and who the club and certain active members asserted seek dissolution of the club; (2) defendant club and it officers, whose objective has been the continuation of the club at a new site in which they appear to be supported by active members and by proprietary members other than those in category (1) above; (3) certain active members who intervened of record, whose position was similar to that of defendants except that they sought a determination of the rights of active members under the club bylaws (which becomes unnecessary to determine upon consummation of the plan of settlement hereinafter described), and (4) nonmember certificate holders, who are persons not members of the club holding proprietary membership certificates of which five formally intervened of record in the early stages of these proceedings alleging inter alia, a right to the proceeds of sale of the club's property pro rata with proprietary members.

The court proceeded to hear testimony introduced on behalf of plaintiffs, which continued for several days, and, before the testimony had been concluded, it became evident that the court could not possibly hear the remaining evidence within the period available before a decision would be required to protect the club's interest under its option to purchase real estate. Thereupon the court entered an order that further

prohibition by the court of action by the duly constituted board of governors and officers of the corporation might deprive the club of the opportunity to purchase a tract of land desired by the members and might jeopardize the existence of or thwart the purposes of the club and subject its members to irreparable harm. In view of the necessity of an early determination of the issues in this case and by agreement of the parties since masters are no longer appointed by the chancellor on his own motion, the court appointed Samuel Weinrott, Esq., as special master for the purposes of conducting immediate hearings, taking testimony and reporting promptly to the court thereon.

After several hearings before the master at which testimony was offered, it became evident to the master, and he informally advised the court, that a compromise appeared to be in the best interest of all parties. Thereupon, extended negotiation between counsel for plaintiffs and counsel for defendants ensued, which ultimately resulted in the submission to the master of the plan of settlement which by interim report dated December 28, 1959, the master recommended to the court for approval.

The provisions of the plan in substance are that the club will pay to nonmember certificate holders the face value of their certificates, viz. $1,000, less any indebtedness due the club by the registered holder, as shown on the club's books. Such indebtedness would include any unpaid balance on account of the purchase price of the certificate, with interest if any thereon, unpaid dues, house accounts, Federal taxes and in some cases other miscellaneous charges. The time of payment of such amounts to nonmember certificate holders is dependent upon settlement of the sale of the club's present property or a determination that such sale will not be completed. Hence, no holder could demand payment

until a time which cannot yet be definitely ascertained, but which will be no later than the fall or early winter of 1961, and which might be earlier.

The plan also provides that certain proprietary members, aggregating approximately 37 in number, shall surrender their certificates and shall thereupon receive from the club $3,000 for each certificate, less their indebtedness due the club; that the payment shall be made to these proprietary members in the event that they shall have resigned on or before March 31, 1960, which was extended by stipulation to April 30, 1960. The time of payment of such proprietary members, as provided in the plan, is stated as of September 15, 1960, but such time of payment has been extended because of the fact that the plan has not been consummated. All other proprietary members, who comprise a substantial majority, are entitled to a like amount, less indebtedness as above noted, the payment of which, however, is postponed until April 30, 1962.

After recommendation of the plan by the master as a fair and equitable settlement of the rights of all parties having any interest in the club, the court, by order of December 29, 1959, directed that further proceedings in the suit be stayed and directed that the plan and amendments to the bylaws of the club contemplated by the plan be submitted to a vote of the members of the club. The master was authorized to attend such meetings, to supervise the votes and to report to the court. As is evidenced by the second interim report of the master, dated February 2, 1960, to which no exception has been taken, three meetings were held on January 14, 1960, at the club, pursuant to proper notice. A quorum was present and voting throughout each respective meeting. The meetings complied with the order of the court, the bylaws of the club and the Nonprofit Corporation Law of this Com-

monwealth. Notwithstanding the acrimony which had marked the difference of opinion between different groups of members of the club in the earlier phases of this litigation, these meetings resulted in unanimous votes in favor of the plan. At the first meeting held at 6:30 p.m., the board of governors of the club decided to recommend to the membership the adoption of the plan and amendment of the bylaws of the club. At the second meeting held at 7:30 p.m., the proprietary members were advised of the board's recommendation. A substantial majority of them attended and voted unanimously to approve the plan. Thereafter, a joint meeting of the proprietary members and of the active members was held in the club house at 8:30 p.m. In order to comply with the unusual provisions of the bylaws of the club, such joint meeting was properly called since the approval of the plan and the amendment of the bylaws was deemed by some to require the approval of both classes of members voting as a single class. This meeting was attended by 157 proprietary and active members, which number substantially exceeded the club's bylaw requirement for a quorum. This group also unanimously approved the plan and an amendment to the bylaws, which in effect eliminates proprietary memberships and membership certificates, conditioned, however, on consummation of the plan in accordance with its terms.

At the time of the approval of the plan by the membership of the club, January 14, 1960, there were approximately 101 proprietary membership certificates held by proprietary members and 199 certificates held by nonmembers. Uncertainty as to the exact number is caused by a dispute as to the status of the registered holders of two certificates. It is not necessary that the status of these two holders be adjudicated at this time.

By letter dated February 17, 1960, the club offered to anticipate the provisions of the plan by purchasing

certificates held by nonmember holders at the amounts provided in the plan, notwithstanding the fact that the plan did not obligate the club to make such purchase at that time. In so doing, the club assumed a considerable expense, and to that end has spent more than $143,000. The court has been advised that 178 nonmember holders surrendered their certificates pursuant to this offer, and that in addition eight certificates were extinguished by reason of the fact that the interest accrued on account of the unpaid balance of such certificates had equaled or exceeded the amount paid to the club for such certificates and that there were 16 nonmember certificate holders remaining (including the two whose status is in doubt and including three others who subsequently surrendered their certificates). Counsel for not more than six of these persons have appeared in objection to this plan. Objection on behalf of one of these nonmember certificate holders has subsequently been withdrawn.

Defendants introduced testimony, including a schedule prepared by the secretary of the club, which shows that the price of certificates transferred by nonmember holders during the last 10 years has ranged from a low of $250 to a high of $500 for full-paid certificates and that no certificate has been transferred for as much as the amount provided in the plan to be paid to the holders. There was undisputed evidence that certificates had been sold as low as $5 and that certificates owned by personal representatives of such former members as the late Mayor Lamberton, a former president judge of this court, and the late Edward T. Stotesbury had sold for token prices. Evidence was heard from a member of the New York Stock Exchange who had experience in the unlisted securities business and from an officer of a local trust company having duties in the trust investment field to the effect that the certificates held by nonmembers had

some but limited market because of their terms. Their estimates of value ranged from $200 to $500 for a full paid certificate. This evidence corroborates evidence as to value previously received by the court. The expert witnesses were extensively cross-examined by several counsel for nonmember certificate holders.

An important factor which necessarily limits value and fair market price of certificates is contained in section 2 of the certificate which provides that ". . . no member shall be compelled for any reason to pay more than $200 on account of this certificate."

The task of the chancellor has been greatly simplified by the sequence of events occurring during the course of the interrupted hearings that resulted in agreement by all parties then of record to a plan for settlement. Making effective the plan will finally dispose of the differences that from time to time have arisen in the club and which have divided the membership into factions and created an atmosphere of discord that should not exist in a social group. The plan is a wise resolution of all the issues. Effecting the settlement agreed upon in the plan eliminates for all time the primary cause of all the litigation, the class of membership known as proprietary members, and it vests the ownership of the property and the entire operation of the club in one class of members, all obligated to pay dues and hence to maintain an interest in the club in bad times as well as good. Additionally, the purchase of a new site for the club is ratified and the relocation of the golf course and club house is provided for, thus insuring the continued carrying out of the purpose clause of a charter, which should be always the principal object of the membership.

The court has given the utmost of its efforts to bring about this settlement between the members of the club

and has considered with great deliberation the various provisions of the plan and unhesitatingly gives them its approval. To eliminate proprietary memberships and the certificates held by former proprietary members, it is necessary that some payment be made by the club for the concession involved. The plan is equitable as to members and former members. It requires what is an adequate and reasonable compensation to the holders of proprietary certificates for the extinguishment of whatever rights the proprietary certificates give to them. These rights are minimal in the light of the provisions subjecting all such certificates to the bylaws of the club, as they may be from time to time, for there is no limit upon the power of the club to alter the terms of such certificates. This was indicated in Kensington National Bank v. Cedarbrook Country Club, 161 Pa. Superior Ct. 407 (1947).

The plan provides that to certain proprietary members who resigned from the club immediately prior to April 30, 1960, shall be paid a sum that we regard as equitable for the extinguishment of their rights and privileges and in settlement of this litigation. These include a number of the proprietary members identified with plaintiffs. As to proprietary members who did not so resign and hence continue to support the club and pay dues and who are to be expected to remain as members, provision is made for payment of a like sum at a later date. Both these groups of proprietary members take these payments in consideration of the surrender of the rights that they have contended represent the sole ownership in the property of the club and certain other privileges. The court does not pass upon the validity of the bylaw provisions of the club by which ownership is vested in one class of members to the exclusion of the larger group of active members, but for the purposes of this litigation the

court is of the opinion that the action of the officers and board of governors in recommending to the members adoption of the plan, including the provisions for the extinguishment of proprietary membership certificates, was justified and in the best interests of the club.

Defendant officers of the club and the active members who intervened in these proceedings contended that a small group including plaintiffs have been motivated by a desire to force the dissolution of the club and the distribution of its assets to the proprietary members. In view of the elimination of such proprietary certificates to be effected by the plan, the court is not called upon to consider a discussion of the motives of plaintiffs, nor the contentions of intervening active members. . . .

Certain nonmember certificate holders were not parties originally to the litigation, but were brought in by service under our order of June 10, 1960, which was confirmed by further order of August 26, 1960. These objectors questioned the jurisdiction of the court as to both person and subject matter and also make objection to the disparity between the amounts payable to nonmember certificate holders and proprietary members of the club. They make sundry other objections as to the jurisdiction of the court. All of the objections were dismissed after due consideration of the arguments presented under an opinion sur rule that was filed as of August 26, 1960, which opinion we incorporate in this adjudication by reference.

It is well at this point to make some observations and conclusions that will clarify the status of the case in the minds of all the parties, including those persons called "Nonmember Certificate Holders." This clarification is necessary before the court proceeds to dispose of the only remaining issues which are raised by these nonmembers who hold certificates. The ob-

jections made by them constitute the only obstacle to the complete approval of the plan of settlement and its consummation. In other words, no objection has been filed of record by any actual member of the club; all of the objectors are at best merely creditors of the club making claim for certain cash payments equivalent to the fair market price of the certificates which they hold. Certainly, nonmembers who are in the position of creditors have no standing to oppose any settlement that the club makes in a contract with its members holding proprietary certificates for the purchase, surrender or extinguishment of such certificates. Such extinguishment by contract is similar to the redemption of preferred stock by a business corporation and a creditor cannot successfully object to such redemption unless there is an impairment of the creditor's rights by dissipation of assets available for payment to him. Neither can a nonmember creditor be hurt by a corporation relieving its members of the payment of interest charges on outstanding balances on the purchase of proprietary certificates, there being absent any insolvency that will affect injuriously the creditor's chances of payment. The club can deal as it pleases with its members under ordinary circumstances, and nonmembers are without right to intervene unless the circumstances just recited exist.

One of the six objectors has advised the court that he has withdrawn his opposition and has surrendered his certificate under the plan. Nonmember certificate holders have raised other questions than those disposed of by our opinion dated August 26, 1960. As indicated, they question the interest charge made on unpaid balances due on the certificates in the hands of nonmembers without averring that any such interest charges have been made on the certificates that they hold. Apparently, the objection is made mainly to the

charge of interest on the certificates held by other holders, and certainly the objectors are third parties without standing to complain of charges made against others. Similarly, nonmembers cannot object to the club waiving the payment of interest on certificates held by those who continue to be dues-paying members of the club unless such waiver of interest impairs the creditor's debt. Additionally, the bylaws of the corporation clearly authorize such discrimination in interest charges between members and nonmembers, this being within the sound discretion of the board of governors. Hence, the court dismisses as completely without merit the exceptions of such objectors as to interest charges.

Counsel for two nonmember certificate holders requested that the record be reopened for the purpose of receiving added testimony apparently on the question raised that nonmembers were not given adequate notice of the terms of the plan. In complying with their request, the court fixed and held an additional hearing on October 11, 1960, when, by agreement of the parties, Francis I. Daly, Jr., Esq., counsel for the Cedarbrook Country Club, was permitted to give evidence in order to avoid the calling of numerous witnesses and hence extended hearings. Counsel for the objectors elicited testimony from Mr. Daly that the club had given no formal notice of the plan to nonmember certificate holders, but on cross-examination, Mr. Daly testified that to his own knowledge approximately 150 of the 199 nonmember certifiate holders were informed as to the terms of the plan, as were representatives of the local press, the substance of the plan having been reported in Philadelphia newspapers. No certificate holder who has surrendered his certificate has asserted any misrepresentation or withholding of information. Furthermore, not being

members of the club, there was an obligation on the corporation to give only such notice as might be given to creditors. Such nonmembers were entitled only to be notified to come in and present their claims, and they had an opportunity so to do before such claims were adjudicated. The few nonmember certificate holders who have not accepted payment cannot be permitted to block and further delay the approval of the plan desired by the large majority of proprietary and active members of the club who desire to pursue their recreational activities in peace and harmony.

Apart from this, all of the five nonmember certificate holders now raising objections communicated informally with the court at a relatively early stage in these proceedings and their counsel was advised of the plan, yet not one of them appeared of record until after the entry of our order and rule to show cause dated June 10, 1960. The exceptions were filed on behalf of the holders of five nonmember certificates held in the names of (i) Henry Hauptfuhrer, Jr., (ii) the trustees under the will of Henry Hauptfuhrer, deceased, (iii) John J. Collmer, (iv) Jere Goffredo and (v) George E. Peterson. There were exceptions filed also by respondent Gartling, but he withdrew them. The remaining exceptions or objections are dismissed as without merit for the reasons above set forth.

The only objectors among such nonmember certificate holders had ample notice of the plan of settlement and full opportunity to present evidence as to the fair market price prevailing for certificates. No such evidence was presented and hence the evidence offered on behalf of the club has established a fair market price.

Not a single member of the club, either proprietary or active, has appeared to object to the plan of settlement the consummation of which will effectively dis-

22

pose of the issues raised between plaintiffs, defendant club and its officers and the active members who have intervened of record, and the bylaw amendment adopted at the meetings held January 14, 1960, and will place the ownership of the club for the first time since 1927 in all the voting members, thus eliminating the proprietary membership certificates that have been the source of repeated and prolonged litigation and dispute.

Further discussion of the amendment to the club's bylaws extinguishing all proprietary membership certificates is unnecessary except to note that all certificate holders took their certificates subject to any amendment of the bylaws. The amendment has been properly authorized. This fact alone is a sufficient basis for the dismissal of the objections raised by nonmember certificate holders. . . .